UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

MOMETAL STRUCTURES, INC.,

                    Plaintiff,            **FINDINGS OF FACT AND
CONCLUSION OF LAW**

      v.                                09-CV-2791 (MKB)

T.A. AHERN CONTRACTORS CORP. and
SAFECO INSURANCE COMPANY OF
AMERICA,

                    Defendants.

-----------------------------------------------------------------x

MARGO K. BRODIE, United States District Judge:

       Plaintiff Mometal Structures, Inc. ("Mometal") filed the above-captioned complaint

against Defendants T.A. Ahern Contractors Corp. ("Ahern") and Safeco Ins. Co. ("Safeco"),

alleging breach of contract. Ahern brought a counterclaim against Mometal for breach of

contract. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. On May 21,

2012, the Court commenced a bench trial. The trial concluded on July 2, 2012. The Court now

makes the following findings of fact and conclusions of law. Only those facts the Court deems

necessary for the resolution of the claims will be discussed. For the reasons set forth below, the

Court finds that Mometal is liable for breach of contract.

## I.    Findings of Fact

       On April 20, 2007, Ahern entered into a contract (the "Contract") with the New York

City School Construction Authority ("SCA") in connection with a public construction

improvement project (the "Project") at New Utrecht High School in Brooklyn, New York. (Def.

Ex. A.) The Project involved renovating an existing building at the high school and adding a

new addition to that building. (Tr. 422:7–423:19.) On July 23, 2007, Ahern entered into a subcontract with Mometal (the "Subcontract"), where Mometal agreed to perform work related to the structural steel and miscellaneous metals for the Project. (Pl. Ex. 1.) The Subcontract price was $1,515,000. (Pl. Ex. 1; Tr. 62:22–63:1.) The Project consisted of three phases: repair of the basement of the existing building ("Phase I"); construction of the new building adjacent to the existing building ("Phase II"); and renovation of a portion of the existing building ("Phase III"). (Tr. 422:12–423:13.) Until Phase I was complete, Mometal could not begin the bulk of its work. (Tr. 384:7–9, 423:2–15.)

Mometal was responsible for fabricating and erecting the structural steel frame for the new building. (Tr. 20:18–21:22.) Mometal's work for the Project included preparing erection and fabrication drawings in accordance with the design drawings and specifications furnished by the SCA. (Pl. Ex. 1; Tr. 21:12–22.) Mometal created drawings based on the structural engineer's drawings and the architect's drawings. (Tr. 22:5–9.) To the extent that these drawings did not provide all of the information Mometal needed or there were discrepancies between the engineer's and architect's drawings, Mometal would submit a Request for Information ("RFI") to Ahern. (Tr. 22:5–19.) Ahern would forward the RFI to the relevant architects or engineers. (Tr. 26:13–15.) The erection and fabrication drawings could not be completed without responses to the RFIs. (Tr. 27:18–22.) After completing an erection drawing, Mometal would submit the drawing to Ahern, who sent the drawing to the SCA's consultants to be reviewed and approved. (Tr. 40:2–8.) Once the erection drawings were approved, Mometal could begin the fabrication drawings. (Tr. 32:2–4.)

Initially, Mometal was only given a verbal schedule, indicating that the erection of steel would begin at the site in October of 2007. (Tr. 47:14–25, 62:13–16, 679:2–8.) As a result,

Mometal created an internal schedule for the erection drawing preparation, fabrication drawing preparation and fabrication. (Tr. 47:14–19.) Phase I of the Project experienced substantial delays caused by design and architectural issues, as well as unforeseen conditions at the Project site. (Tr. 87:15–21, 455:3–456:6, 679:11–23.) The problems in Phase I also caused the SCA to modify the design for the new building. (Tr. 622:9–25.) In October of 2007, the site did not have a foundation and excavation was not complete. (Tr. 459:11–23, 679:6–16.) Therefore, Mometal could not begin erection. (Tr. 459:11–23, 679:6–16.) On November 15, 2007, Mometal provided Ahern with a preliminary crane logistics plan. (Pl. Ex. 14.) Mometal also sent Ahern all of the erection drawings that it was able to complete at that point in time. (Tr. 29:21–30:1.) The balance of the drawings could not be completed because Mometal was waiting for responses to the RFIs sent to Ahern. (Tr. 30:1–4.)

On November 15, 2007, and again on December 20, 2007, Mometal wrote to Ahern, identifying the outstanding information that it required prior to fabrication, including a survey, a revised schedule, approval of outstanding drawings, responses to outstanding RFIs and approval of Mometal's crane logistics plan establishing the location of the crane that would be used in the erection process. (Pl. Ex. 2.) Mometal could not fabricate the steel without the necessary information and approval of its drawings. (Tr. 31:22–32:4.) Mometal ordered the deck that would be required for the new building, but the supplier could not cut it to size because Ahern had not provided Mometal with the dimensions. (Tr. 74:22–75:25, 113:2–114:22.) As part of Mometal's work, Mometal was required to fabricate a steel channel that would be attached to the existing building and connect it to the new building. (Tr. 328:1–7.) On February 11, 2008, Marc-Antoine Bienvenue, Mometal's project manager, sent an e-mail to Gus Michaelides, Ahern's project manager, stating that Mometal's superintendent "had been on site this morning

and it's [sic] seem that the site will not be ready for the February 18, 2008." (Pl. Ex. 16.) At that time, the steel channel was fabricated and ready for delivery, but there was still a twelve-foot deep excavation that prevented access. (Tr. 131:20–25, 677:19–678:5.) On February 27, 2008, Mometal submitted a change order to Ahern regarding the increased cost of the steel for the deck as a result of the delay in the erection date. (Pl. Ex. 3.) Ahern never responded to Mometal. (Tr. 74:4–14.)

On April 21, 2008, Ahern sent Mometal a memorandum (the "Speed Memo"), informing Mometal that the structural steel was to be "on site no later than the middle of June 2008." (Pl. Ex. 18.) Ahern directed Mometal to proceed with the "resurveying of the stake out of the new addition," which was a reference to the change in the dimensions of the new addition that had occurred. (Pl. Ex. 18; Tr. 319:14–320:2.) At this point, Ahern had still not provided Mometal with the information it needed to complete the fabrication drawings. (Tr. 105:10–16.) Prior to sending the Speed Memo, Ahern had not provided Mometal with any information regarding a revised start date, despite Mometal's repeated request for a revised schedule. (Tr. 321:8–20.) In the period between September of 2007, when fabrication was supposed to begin, and April of 2008, when Ahern sent the Speed Memo, the price of structural steel increased. (Tr. 135:2–6.) On April 25, 2008, Mometal sent Ahern a letter responding to the Speed Memo. (Pl. Ex. 19.) Mometal informed Ahern that Mometal was seeking escalation costs based on the nine-month delay in the steel erection. *Id.* Mometal informed Ahern that a change order of $64,199.25 must be issued before Mometal could buy steel and start fabrication. *Id.* at 2. Ahern never responded to the letter. (Tr. 321:8–20.)

On April 28, 2008, Mometal sent Ahern an additional response to the Speed Memo to summarize the "outstanding information required prior [to] the fabrication." (Pl. Ex. 20.)

Specifically, Mometal requested a revised schedule, approval of all outstanding items and an executed change order addressing the various change proposals regarding escalation costs. *Id.* Ahern did not respond to Mometal. (Tr. 323:10–14.) On May 13, 2008, Mometal sent Ahern another letter detailing the outstanding information. (Pl. Ex. 21.) Mometal stated that it could no longer meet the July 1, 2008 erection date because Ahern had failed to provide Mometal any of the information requested. *Id.* Mometal once again set forth its outstanding requests. *Id.* at 1–2. At this time, the foundation at the site was still not ready for erection. (Tr. 621:11–13, 680:1–24.) On June 6, 2008, Mometal sent Ahern another letter regarding outstanding information. (Pl. Ex. 22.) By this time Ahern had provided some of the information Mometal requested, but the majority of the requests were still outstanding. *Id.* at 2. On June 27, 2008, Mometal provided Ahern with updated information concerning the escalation costs of steel and labor. (Pl. Exs. 24, 25.) Ahern did not respond to either of these letters. (Tr. 331:24–25.)

On June 30, 2008, Mometal sent Ahern another letter, informing Ahern that the majority of the information that it had requested was still outstanding. (Pl. Ex. 23.) Mometal proposed that its letter be the agenda for a meeting scheduled for July 2, 2008. *Id.* The letter noted that the foundation was still not complete and that certain actions needed to be taken at the site before erection could begin. *Id.* at 4. That day, Mometal sent Ahern another letter, confirming that it had received approval from the SCA for the logistical plan but noting that Ahern had still not given its approval for the logistical plan, which had been outstanding for over 200 days. (Pl. Ex. 26.) On July 9, 2008, Mometal sent Ahern a letter identifying the RFIs that were outstanding, some of which had been outstanding for more than 170 days. (Pl. Ex. 27.) Ahern did not respond. (Tr. 335:19–20.) On July 23, 2008, at the request of Tim Ahern, the President of Ahern, Mometal provided a summary of the events that had delayed the steel erection start date.

(Pl. Ex. 6; Tr. 347:14–25.)  Mometal stated that the delays were caused by, among other things, Ahern's failure to respond to letters seeking information, delays in forwarding RFIs to relevant consultants and in forwarding responses to RFIs and failure to provide Mometal the surveys and information necessary to complete the shop drawings.  (Pl. Ex. 6.)

On July 23, 2008, Mometal submitted an application for payment to Ahern, indicating that it was owed $77,550.  (Pl. Ex. 12.)  Ahern paid Mometal a total of $53,200 for its work on the Project.  (Tr. 626:1–3.)  On July 29, 2008, Arrigo Ciccarelli, the General Manager of Mometal, sent a letter to Ahern, requesting a meeting to discuss the steel escalation costs incurred.  (Def. Ex. Z.)  Ciccarelli stated that "Mometal will not commit to an erection start date until a meeting is held with the SCA seniors' office responsible for this project."  *Id.*  On August 7, 2008, Mometal and Ahern met with the SCA at the SCA's office.  (Tr. 91:13–24.)  At the end of the meeting, the SCA turned to Ahern and said that if Mometal would not commit to fabrication and erection, Ahern would have to hire someone else.  (Tr. 464:22–465:1, 468:3–8.)

On August 8, 2008, Mometal informed Ahern that, in light of the August 7 meeting, Mometal had decided to consult its legal adviser.  (Def. Ex. FF.)  On August 11, 2008, Mometal advised Ahern that it would start erecting the structural steel on September 22, 2008, provided that Ahern first met Mometal's seven conditions.  (Pl. Ex. 7.)  The conditions were as follows: (1) the site must be fully available and foundation work fully complete by September 12, 2008; (2) all shop drawings must be returned and approved by August 15, 2008; (3) Ahern, the SCA and Mometal must come to an agreement on the amount claimed by Mometal as a result of the Project delays and a change order must be issued to cover the amount agreed; (4) all parties must agree to joint check payment; (5) Ahern must issue a letter voiding article 9.3 of the Subcontract, which relates to liquidated damages; (6) Ahern must issue a letter holding Mometal free of

responsibility for any acceleration costs in the past or in the future; and (7) Ahern must pay for the storage of fabricated material. *Id.* With regard to the third item, Ciccarelli testified:

> After the meeting, I personally said I will not proceed with this additional work because after six or nine months and we've been turning around with the project, a letter of demands, information not given to us, I lost faith in Ahern so I was considering that I will do the extra work, spend the money and maybe never get the money, maybe never get paid. So I want to make sure. I said you want me to proceed, we will proceed, we will do it but you have to commit yourself as well.

(Tr. 94:1–9.) At the time this letter was written, Mometal did not intend to proceed with erection, unless these seven conditions were met. (Tr. 241:24–242:2.) However, Mometal did not cease performance of its work under the Subcontract at any point prior to termination. (Tr. 242:3–6.)

On August 15, 2008, Ahern notified Mometal that "Mometal is presently in default and breach" of the Subcontract. (Pl. Ex. 8.) The default letter alleged the following breaches: (1) failure to comply with the directives and orders of the general contractor; (2) failure to timely and diligently prosecute its scope of work, including but not limited to failure to produce required shop drawings, failure to revise and resubmit required shop drawings, failure to place necessary long-lead material orders, failure to release for fabrication materials required under the Subcontract and failure to attend job progress meetings; and (3) issuance of demands and cessation of work on the project "seeking relief beyond the express terms of the subcontract and the contract documents." *Id.* The default letter further stated that unless Mometal cured the defects and withdrew its demands "conditioning resumption of its performance upon modification of the underlying subcontract . . . , the subcontract will be deemed terminated pursuant to its terms and conditions." *Id.*

On August 19, 2008, Mometal responded, disputing the allegations in the default letter. (Pl. Ex. 9.) Mometal informed Ahern that it was "still working on finalizing the shop drawings

required prior to fabrication and will be ready for an erection start date on **9/22/08**." *Id.* at 2 (emphasis in original). However, Mometal reiterated the conditions set forth in its August 11, 2008 letter. *Id.* Ciccarelli testified that Mometal did not intend to move forward with fabrication and erection unless its seven conditions were met. (Tr. 247:9–20.) Ahern did not respond to Mometal's letter. (Tr. 123:19–24.) Mometal continued to perform its work for the Project. On August 25, 2008, Mometal advised Ahern that "[t]he footprint along the existing building is still not level" and did not permit Mometal to install the channel to the existing building. (Pl. Ex. 29.) Mometal also noted that "[t]here is still plumbing work incomplete and material and equipment in our way." *Id.* While at the site that day, Mometal's site superintendent informed Mometal that Ahern had decided to give the fabrication and erection work to another company. *Id.* Mometal requested confirmation of that decision within 24 hours. *Id.*

On August 26, 2008, Ahern informed Mometal that it was terminating the Subcontract. (Pl. Ex. 10.) In the termination letter, Ahern stated that it had served Mometal with a notice of default, as required by the Subcontract, and Mometal had made "no material effort to cure its deficient performance under the Subcontract and . . . remains in material breach of the Subcontract." *Id.* Most significantly, Mometal had not withdrawn the conditions set forth in its earlier letter. (Tr. 483:3–13.) The termination became effective August 27, 2008 at 8:00 in the morning. (Pl. Ex. 10.) Upon receipt of the termination letter, Mometal stopped work on the Project. (Tr. 126:12–17.) Ciccarelli and Gilles Poirier, Mometal's operation manager, attempted to call Tim Ahern, but he refused to take their calls. (Tr. 126:17–25.)

Mometal also sent Ahern a letter in response to the termination. (Pl. Ex. 11.) Mometal disputed Ahern's claims of material breach, noting once again that Mometal had "performed all of the work that [it] possibly could have to this point in time" and had been "diligently working

to be ready for the start of erection on September 22, 2008." *Id.* Regarding Mometal's request

for escalation costs, Mometal noted that "T.A. Ahern's delay has greatly increased Mometal's

cost of steel procurement, an overrun which Mometal has been attempting to recover in an

amicable manner." *Id.* at 2. Mometal maintained "that it is Mometal's firm position that T.A.

Ahern has breached its duties to Mometal under the subcontract and, as a consequence, is liable

to Mometal for damages. Nevertheless, Mometal has always perform[ed] its work on this project

and will continued to do so, unless T.A. Ahern is unwilling to withdraw its termination letter of

today, in which case it will cease work at the close of business today." *Id.* Finally, Mometal

reaffirmed its desire to continue working on the Project and reach an amicable resolution:

"Mometal remains willing to continue to perform the work for this project and to attempt one last

time to make an accommodation with T.A. Ahern." *Id.* Ahern did not respond. (Tr. 137:17–21,

143:6–10.)

Mometal stopped working on the Project on August 26, 2008. (Tr. 143:15–20.) At the

time of the termination, Mometal had completed and received approval for 95 percent of the

structural drawings and 70 percent of the miscellaneous metal drawings. (Tr. 214:15–17, 405:4–

19.) In responding to the termination letter, Mometal stated that it did not consent to the use of

any of its drawings on the Project and specifically warned that the drawings were not ready. (Pl.

Ex. 11 at 2; Tr. 138:6–17.) As a result of the water conditions at the site, the start date was

pushed back to October of 2008. (Tr. 680:13–681:8.) The Project was not completed until

September of 2009. (Tr. 457:22–458:1.)

After the termination, Ahern entered into a subcontract with Feinstein Iron Works, Inc.

("Feinstein"). (Def. Ex. QQ; Tr. 490:24–491:5.) Ahern's contract with Feinstein was for

$1,973,000. (Def. Ex. QQ at 10.) The Feinstein contract did not include steel framing at the

security walls, which was originally included in Mometal's scope of work. (Def. Ex. QQ at 9; Tr. 581:10–18.) Feinstein ultimately performed this work at the security walls and issued a change order for $102,565. (Def. Ex. TT; Tr. 581:19–20.) After negotiations, Ahern paid Feinstein $96,000. (Tr. 643:4–12.) The Feinstein contract price did not take into account any of the materials, documents or drawings prepared by Mometal. (Tr. 555:16–24.) Rather, the contract anticipated that Feinstein would "do all his own shop drawings, calculations and have his New York State licensed professional engineer's stamp[] and approve the entire project." (Tr. 555:21–24.) Mometal had not completed the shop drawings when the Subcontract was terminated. (Tr. 623:4–9.) Still, Ahern provided Feinstein with Mometal's shop drawings, deck drawings, erection drawings and sealed calculations. (Tr. 673:4–674:4.) Feinstein then assumed the obligation as part of its contract to finish all of the drawings and calculations and get them approved. (Tr. 675:1–5.)

## II. Conclusions of Law

### a. Liability

Mometal and Ahern both bring claims for breach of contract. To recover on a breach of contract claim under New York law, the non-breaching party must establish (1) the existence of a valid contract, (2) performance of the contract by the injured party, (3) breach by the other party and (4) damages to the injured party as a result of the breach. *Barbara v. MarineMax, Inc.*, No. 12 Civ. 368, 2012 WL 6025604, at *16 (E.D.N.Y. Dec. 4, 2012); *see also Noise In the Attic Prods., Inc. v. London Records*, 782 N.Y.S.2d 1, 3 (App. Div. 2004). Here, the parties do not dispute the existence of a valid contract. However, Mometal and Ahern both contend that the other party breached. Ahern argues that Mometal breached the contract, when it required that Ahern agree, among other things, to modify the Subcontract before Mometal would commence

fabrication and erection. (Def. Post-Trial Br. 7.) Mometal claims that it performed all of its

obligations under the Subcontract and that Ahern breached the contract, when it wrongfully

terminated the Subcontract. (Pl. Post-Trial Br. 10.)

### i. The Disputed Work Provision

As an initial matter, the Court finds that Mometal was not permitted to cease performance

under the Subcontract, even if Mometal believed that the work at issue was "extra work" outside

of the scope of the Subcontract. The Subcontract was an American Institute of Architects

("AIA") Standard Form Agreement, and it incorporated the terms and conditions of the Contract.

(Pl. Ex. 1; Tr. 210:15–24.) Section 8.01 of the Contract, governing claims for extra work,

provides that:

> If the Contractor claims that any Work which the Contractor has been ordered to
> perform will be Extra Work, that the Contractor for any reason cannot comply
> with the terms and provisions of the Contract, or that any action or omission of
> the SCA is contrary to the terms and provisions of the Contract and will require
> the Contractor to perform Extra Work the Contractor shall:
>
> 1.    Promptly comply with the SCA's direction to perform the Work which
>       the Contractor claims will be Extra Work; and
>
> 2.    Proceed diligently, pending and subsequent to the determination of the
>       SCA with respect to any said disputed matter, with their performance of
>       the Work in accordance with all instructions of the SCA.

(Def. Ex. A at 25.) The New York Court of Appeals has held that contract provisions governing

the procedure for disputes regarding extra work are enforceable. *Kalisch-Jarcho, Inc. v. City of

New York*, 72 N.Y.2d 727, 734–35 (1988); *see also Westinghouse Elec. Corp. v. N.Y.C. Transit

Auth.*, 794 F. Supp. 79, 84 (S.D.N.Y. 1991) ("The contractual structure is clear enough.

Westinghouse was obligated to prosecute the work 'continuously and diligently,' and to submit

disputes to the Superintendent under Article 8.03, while continuing the work to the maximum

extent possible."), *aff'd*, 14 F.3d 818 (2d Cir. 1994); *Beckhard Richlan Szerbaty & Assoc., L.L.P.*

*v. AMCC Corp.*, 798 N.Y.S.2d 342, 2004 WL 1852489, at *1–2 (Sup. Ct. 2004) (noting that

"there appears to be a clear cut violation of the subcontract by the plaintiff" where the plaintiff

ceased performance pending the resolution of a dispute, despite the existence of a disputed work

provision). Moreover, Ciccarelli testified that he understood that, even if Mometal believed that

certain work was outside the scope of the contract, Mometal was required to continue performing

the work "under protest." (Tr. 223:2–10.) Ciccarelli also acknowledged that the escalation costs

at issue in the instant action were not extra work but were work covered in the original contract.

(Tr. 223:14–17.) Therefore, the Court finds that Mometal was not entitled to cease performance

under the Subcontract pending the resolution of its dispute with Ahern.

### ii. Termination for Cause

Ahern claims that the Subcontract was properly terminated after Mometal failed to cure

the defects set forth in Ahern's Notice of Default. (Def. Post-Trial Br. 7.) Paragraph 7.2.1 of the

Subcontract provides that "the Contractor may terminate or suspend performance of the

Subcontract for the same reasons and under the same circumstances and procedures with respect

to the Subcontractor as the Owner may terminate or suspend performance of the Contract." (Pl.

Ex. 1 at 7.) Section 10.01 of the Contract, governing termination for cause, provides that:

> A.  Upon the occurrence of any of the following events, the SCA may, in addition to all other rights the SCA may have as provided by law or equity, including the right to terminate the Contract immediately because of a material breach, terminate this Contract for cause:
>
> 1.  The SCA's President, or the President's designee, determines that a violation of a provision of this Contract shall have occurred due to the fault of the Contractor and the Contractor fails to cure such violation within ten (10) days after receipt of Notice to Cure ("Cure Notice") from the SCA specifying the nature of such default.

(Def. Ex. A. at 28.) On August 15, 2008, Ahern sent Mometal the Notice of Default. (Pl. Ex. 8.)

Specifically, the Notice of Default claimed that Mometal breached in the following ways:

(1) failing to comply with the directives and orders of the general contractor; (2) failing to timely and diligently prosecute its scope of work, including but not limited to failure to produce required shop drawings, failure to revise and resubmit required shop drawings, failure to place necessary long-lead material orders, failure to release for fabrication materials required under the Subcontract and failure to attend job progress meetings; and (3) issuing of demands and ceasing work on the project "seeking relief beyond the express terms of the subcontract and the contract documents." *Id.* The Notice of Default states, among other things, that unless Mometal's demands "are immediately withdrawn, the subcontract will be deemed terminated pursuant to its terms and conditions." *Id.*

The record at trial clearly established that the first two items listed in the default letter are wholly without merit. Mometal complied with any and all directives from Ahern, and Mometal timely and diligently performed all of the work that it was able to perform given the information it was provided. The final alleged defect claims that Mometal issued demands beyond the scope of the contract and ceased performance. As previously discussed, Mometal was not entitled to cease performance under the Subcontract, even if it believed that the work was beyond the scope of the contract. Rather, Mometal was required under the disputed work provision to continue performing the work at issue under protest. (Def. Ex. A at 25.) Mometal did not cease performance at any point prior to the termination of the Subcontract. However, Mometal did inform Ahern that it did not intend to fabricate or erect any steel until Ahern had agreed to Mometal's conditions. Accordingly, the issue is whether Mometal's demands and threatened nonperformance constitute an anticipatory repudiation of the Subcontract.

 "Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. Int'l Bus.*

*Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002)). "Repudiation occurs when 'a party has attempted to avoid its obligations by advancing an 'untenable' interpretation of the contract, or has communicated its intent to perform only upon the satisfaction of extracontractual conditions.'" *In re Best Payphones, Inc.*, 450 F. App'x 8, 11 (2d Cir. 2011) (quoting *SPI Comm'cn, Inc. v. WTZA-TV Assoc. Ltd. P'ship*, 644 N.Y.S.2d 788, 790 (App. Div. 1996)); *see also Royal Dispatch Servs., Inc. v. UBS Fin. Servs., Inc.*, No. 12 Civ. 2032, 2012 WL 3113291, at *2 (E.D.N.Y. July 31, 2012) ("New York recognizes that 'the insistence on an untenable interpretation of a key contractual provision, and refusal to perform otherwise, constitutes an anticipatory breach of the contract.'" (alterations omitted) (quoting *IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*, 92 N.Y.2d 989, 993 (1998))). "However, a repudiation can be determined to have occurred only when it is shown that 'the announcement of an intention not to perform was positive and unequivocal.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (quoting *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 150 (1978)). Repudiation of a contract is "a factual determination [and is] heavily dependent upon a determination of whether 'a breaching party's words or deeds are unequivocal.'" *Fonda v. First Pioneer Farm Credit, ACA*, 927 N.Y.S.2d 417, 419 (App. Div. 2011) (citation omitted).

Mometal's August 11, 2008 letter was a clear and unequivocal refusal to perform, unless Ahern agreed to modify the terms of the Subcontract. Mometal stated that it would only start erection if Ahern met the seven conditions set forth in its letter. (Pl. Ex. 7.) Certain conditions, including requirements that Ahern agree to pay the steel escalation costs and storage costs and issue a letter "voiding subcontract article 9.3 pertaining to liquidated damages," were modifications to the Subcontract. *Id.* Ahern informed Mometal that it was in default in part

because of the "issuance of demands . . . seeking relief beyond the express terms of the subcontract and the contract documents." (Pl. Ex. 8.) Instead of withdrawing the conditions set forth in the August 11 letter, Mometal reiterated the conditions in its August 19, 2008 letter. (Pl. Ex. 9.) Moreover, at trial, Mometal once again reiterated that it did not have any intention of moving forward with the fabrication and erection of the steel unless Ahern met its conditions. (Tr. 241:13–242:2, 247:9–20, 252:3–15.) Mometal's requirement that Ahern agree to modifications of the Subcontract before Mometal would perform its contractual obligations constitutes an anticipatory breach of the Subcontract. *Fonda*, 927 N.Y.S.2d at 419–20 (finding evidence of an anticipatory breach, where the plaintiff claimed that the "defendant unequivocally communicated its intent to require plaintiffs to comply with an extracontractual condition before it would reimburse them for repairs"). Accordingly, the Court finds that Mometal is liable for breach of contract for its repudiation of the Subcontract. Mometal's claims against defendants Ahern and Safeco are dismissed.[1]

### b. Damages

Under New York law, the party "complaining of injury has the burden of proving the extent of the harm suffered." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 40 (2d Cir. 2009) (quoting *Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 686 (1978)). "In general, the proper measure of damages for breach of a construction contract is the cost to either repair the defective construction or complete the contemplated construction." *Haber v. Gutmann*, 882

---

[1] Mometal brought a claim under the payment bond against defendant Safeco pursuant to New York State Finance Law § 137. "[I]t is a well settled rule in [New York] that the liability of the surety is measured by the liability of the principal." *Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.*, No. 07 Civ. 5415, 2010 WL 3735786, at *4 (E.D.N.Y. Sept. 20, 2010) (citation omitted); *see also Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 726 F. Supp. 2d 339, 343 (S.D.N.Y. 2010) (collecting cases). Accordingly, Plaintiff's claim against Safeco must be dismissed because Ahern has no liability. *Underpinning & Found. Skanska*, 2010 WL 3735786, at *4.

N.Y.S.2d 780, 782 (App. Div. 2009); *see also Breeze Const. Inc. v. CGU Ins. Co.*, No. 03 Civ. 2452, 2010 WL 475107, at *4 (E.D.N.Y. Feb. 5, 2010) ("When a construction contractor is properly terminated, the contractor is responsible for the fair and reasonable cost of completing the construction." (citing *Ferreira v. Saccento*, 729 N.Y.S.2d 178, 179 (App. Div. 2001))). "However, expenditures which were clearly not within the scope of a contract cannot be used to inflate the completion cost." *Morris v. Lee*, No. 08 Civ. 6673, 2011 WL 721663, at *7 (S.D.N.Y. Feb. 24, 2011). The damages "must be reasonably certain . . . [and] not based upon speculation." *Haber*, 882 N.Y.S.2d at 783.

Ahern seeks damages in the amount of $808,893 and reasonable attorneys' fees. Specifically, Ahern alleges that it incurred the following damages: "(i) costs incurred in completing Mometal's work; (ii) costs incurred to remediate and/or correct Mometal's deficient performance; (iii) costs to provide additional project supervision and management to assimilate the completion steel subcontractor into the Project; (iv) costs to provide temporary heat for the Project needed because of Mometal's termination; and (v) attorneys' fees and expenses incurred by Ahern as a result of Mometal's default and termination." (Def. Post-Trial Br. 34.)

### 1. Completion Costs

Ahern's contract with Feinstein was for $1,973,000. (Def. Ex. QQ at 10.) Ahern paid Feinstein an additional $96,000 for the steel security wall, which was included in Mometal's contract but excluded from Feinstein's contract. (Def. Exs. TT; Tr. 643:4–12.) Ahern, therefore, paid Feinstein $2,069,000 to complete Mometal's work on the Project. Mometal's contract price was $1,515,000, and Ahern paid Mometal $53,200 prior to termination. (Pl. Ex. 1; Tr. 626:1–3.) Therefore, the net balance remaining on the Subcontract was $1,461,800. Accordingly, Ahern is entitled to $607,200 in damages for completion of Mometal's work under the Subcontract.

## 2. Corrective Work

### a. Feinstein's Change Orders

Ahern claims that it had to pay Feinstein for a number of costs incurred as a result of errors in Mometal's drawings. (Def. Post-Trial Br. 37–39.) First, Ahern claims that it is entitled to the cost of corrective work that Feinstein had to perform on two steel beams in the amount of $9,200. (Def. Ex. SS; Tr. 645:5–25.) The elevation of two steel beams in the approved shop drawings was different than in the original design documents. (Tr. 723:19–724:1.) As a result, Feinstein had to make modifications to the two beams. (Tr. 645:5–9.) Ahern argues that the discrepancy and the resulting costs are attributable to Mometal because Mometal initiated the drawing. (Tr. 724:4–15.) However, Ahern has not provided any credible evidence establishing that Mometal is responsible for the design change. In any event, the designs at issue were approved by the architect and engineer of record, and the fabrication and erection was done by Feinstein. Moreover, as Michaelides testified, the Feinstein contract anticipated that Feinstein would "do all his own shop drawings, calculations and have his New York State licensed professional engineer's stamp[] and approve the entire project." (Tr. 555:21–24.) Ahern is not entitled to recover costs associated with the modification to the design from Mometal.

Second, Ahern seeks $20,500, which it paid Feinstein to replace metal decking on the second floor and the first floor. (Def. Exs. RR, UU; Tr. 649:9–22, 736:15–737:3.) With regard to the second floor, Feinstein installed a three-inch metal deck. (Tr. 717:7–8.) That deck then needed to be replaced with a one-and-a-half inch metal deck. (Def. Ex. UU.) Feinstein claimed that Mometal's deck drawing did not show the relevant area correctly. *Id.* However, Ahern concedes that it does not know whether the shop drawings at issue were completed by Mometal or Feinstein. (Tr. 737:2–10.) Similarly, on the first floor, Feinstein installed a three-inch deck,

which had to be replaced by a two-inch deck. (Def. Ex. RR.) Feinstein received a Mometal drawing of the deck dated September 4, 2007, but did not receive any approval of the deck drawing. (Def. Ex. RR; Tr. 718:6–15.) Ahern directed Feinstein to order the deck based on the drawings it received, even though the drawings had not been approved. (Def. Ex. RR; Tr. 718:16–21.) As Michaelides testified at trial, Feinstein needed approved deck drawings before it could order the deck, and Feinstein, who ordered the deck without approved drawings, was responsible for any problems caused by the unapproved deck. (Tr. 719:9–15.) Ahern has failed to establish that the alleged design errors with respect to the deck are attributable to Mometal, and, therefore, Mometal is not liable for costs related to replacing the decks on the first or second floor.

Third, Ahern seeks $7,560 that it paid Feinstein for concrete pour stops for the metal deck that were not shown on the shop drawings. (Def. Exs. WW; Tr. 727:15–22.) Again, Ahern argues that these additional costs were incurred as a result of errors in Mometal's approved shop drawings because the pour stops were not shown on the shop drawings. (Tr. 650:21–651:2.) As previously stated, Ahern cannot seek damages for any costs incurred as a result of *approved* shop drawings, simply because Mometal partially drafted the drawings. Moreover, pour stops are always required on metal decking when concrete is poured. (Tr. 728:2–4.) Ahern, the SCA and its consultants, Mometal and Feinstein all knew that pour stops were required for the metal deck. (Tr. 728:5–7.) Ahern has not met its burden of proving that it is entitled to damages related to these alleged errors in the fabrication and erection drawings.

### b. Shoring and Leveling

Ahern also claims it is entitled to $44,060 in damages for costs it incurred as a result of a change in the second floor design, which eliminated seven steel beams originally in the design

drawings. (Def. Ex. AAA; Tr. 586:3–11.) As a result of the elimination of the beams, Ahern claims that it had to perform additional shoring and leveling on the second floor. (Tr. 652:21–653:4.) The design drawings originally included seven beams on the second floor. (Tr. 693:15–25.) These beams were not in the drawings approved by the engineer and the architect. (Tr. 694:1–6.) Feinstein reviewed the drawings and did not mention the missing beams. (Tr. 695:14–19.) Ahern attempted to recover the costs of this shoring from the SCA, offering a $10,000 credit for the seven steel beams omitted from the design and requesting $47,000 for the shoring work. (Tr. 702:18–703:7.) The SCA took responsibility for the design change, but only allotted $17,000 to Ahern for the shoring work and found that Ahern owed the SCA $13,500 for the seven beams that it no longer had to fabricate. (Tr. 657:11–658:11, 702:18–703:7.) Therefore, the SCA paid Ahern a net sum of $3,700. *Id.* Ahern claims that this change cost it $47,760 but the SCA only paid it $3,700. (Tr. 657:11–658:11.) Therefore, Ahern seeks the balance of $44,060 from Mometal.

As the Court has previously stated and as is made even clearer by the fact that the SCA took responsibility for costs associated with the design change, Mometal is not liable for costs that occurred during erection as a result of drawings that were approved by the architect and engineer of record. Simply because the SCA did not pay Ahern the total amount of money it sought, that does not mean that Mometal is responsible. Ahern is not entitled to damages associated with the shoring or the leveling of the second floor.[2]

---

[2] Ahern also seeks to recoup the $13,500 credit it paid the SCA for the eliminated beams. (Def. Post-Trial Br. 35 n.14.) As discussed, Ahern cannot recoup alleged damages from Mometal for designs that the SCA's architect and engineer approved and that Feinstein executed after Mometal had been terminated. Moreover, if Ahern is entitled to recover the credit from any entity, it is Feinstein, who had seven less steel beams to fabricate and erect as a result of the design change.

### 3. Transition Costs

Ahern seeks the costs associated with transitioning the project to Feinstein. (Tr. 658:20–24.) Ahern's calculation of $63,000 is based on an allocation of 60 days for Michaelides, 60 days for the assistant project manager and 30 days for the senior project manager. (Tr. 658:25–660:3.) Ahern did not provide any evidence or details related to this alleged cost. Nor did Ahern present any evidence that it was required to hire additional employees or incur any other actual costs as a result of the transition. Moreover, the Court did not find Michaelides's testimony regarding the factual basis of this claim to be credible. Rather, it appears that this figure is merely an estimate. Accordingly, Ahern has not met its burden in establishing that it is entitled to transition costs. *See Intermetal Fabricators, Inc. v. Losco Group, Inc.*, No. 97 Civ. 3519, 2000 WL 1154249, at *12 (S.D.N.Y. Aug. 14, 2000) ("A court may not award damages on the basis of conjecture and guesswork, but rather, damages must be proven with reasonable certainty.").

### 4. Temporary Heat

Finally, Ahern seeks $60,630.42 for the cost of providing temporary heat to the building. (Def. Ex. MMM; Tr. 661:6–18.) Ahern claims that this cost is attributed to Mometal "because we found ourselves a year later trying to finish the job that is supposed to span a 20-months [sic] period and I lost a year at the beginning." (Tr. 663:2–6.) Through no fault of Mometal, the site was not ready for erection until October of 2008. (Tr. 680:18–681: 9.) Ahern terminated Mometal's contract on August 26, 2008 and entered into a contract with Feinstein on September 3, 2008. (Tr. 681:10–17.) As Michaelides testified, Feinstein had sufficient time to prepare for an erection start date in October of 2008. (Tr. 681:22–682:2.) In fact, Feinstein started erection towards the end of October of 2008. (Tr. 682:3–5.) Moreover, the original contract scheduled

construction in October or November of 2008, and, therefore, the original contract would have included temporary heat in Ahern's contract. (Tr. 763:11–21.) Mometal's breach had no effect on the start date of erection. Therefore, there is no evidence in the record to support a finding that the costs of temporary heat were incurred as a result of Mometal's breach.

## III.    Conclusion

For the foregoing reasons, the Court finds that Mometal is liable for breach of contract. Mometal's claims against Ahern and Safeco are dismissed. Ahern is awarded damages in the amount of $607,200, as well as reasonable attorneys' fees[3] and pre-judgment interest at a rate of nine percent beginning January 25, 2010. *See* N.Y. C.P.L.R §§ 5001, 5004. The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  February 28, 2013
          Brooklyn, New York

---

[3] Under the Subcontract, Ahern is entitled to attorneys' fees if the Subcontract is terminated due to the fault of Mometal. (Pl. Ex. 1 at 7–8.)